Chad Peckron for the plaintiff's appellants. On this motion to dismiss, the district court was required to view the facts in the light most favorable to the plaintiffs in order to determine whether those facts supported a reasonable inference that the defendants were subject to personal jurisdiction in Arkansas. Those facts, as stated in the complaint in the supporting affidavit, demonstrate that they were subject to personal jurisdiction in Arkansas and require reversal. Those facts, I'll briefly state, are as follows. In January 2017, the plaintiffs traveled to Los Angeles for a meeting with the defendant Jimmy Esebag. During that meeting, Mr. Esebag, who was the 100% owner of the other defendant, United Licensing Group, or ULG, had allegedly developed a product called Dr. Boost. Mr. Esebag made certain misrepresentations about that product during that meeting. After the plaintiffs returned to Arkansas, however, the defendants continued to bombard them for months with calls, emails, and text messages designed to get them to invest in ULG. Defendants sent those communications to plaintiffs knowing that they would be received at their homes in Arkansas. Unfortunately, that stream of communications contained two material misrepresentations about ULG and Mr. Esebag. First, there was a misrepresentation that the Dr. Boost product was almost ready for market. Second, there was a misrepresentation by Mr. Esebag that once it was ready for market, he would invest approximately $20 million of his own funds in marketing the product. Based upon those misrepresentations, plaintiffs sent defendants $2.5 million from their bank account in Arkansas as an initial investment in ULG. After that initial investment, however, the defendants continued to bombard the plaintiffs in Arkansas with additional misrepresentations about ULG to get them to sign a contract. Now, did the misrepresentations happen during the electronic communications, or did they happen when they met out in, was it California, I think? Your Honor, there were misrepresentations in the meeting in California, but there were also misrepresentations in an email that we included in the record, and there were numerous text messages that set up phone calls where plaintiffs were in Arkansas and defendants were in California, and those same misrepresentations were repeated during those phone calls. They first came up, though, in California, and they subsequently came up in these other communications, correct? Exactly. They began in Arkansas, and they followed them up in Arkansas. Very similar to the felon case from the Seventh Circuit that we cited in our briefs, the initial misrepresentation in that case was made in Arizona. The contract was made in Arizona. The plaintiffs went back to Wisconsin and started having questions. The defendant, who was still in Arizona, kept sending them emails, telephone calls, all is well, all is well, nothing to worry about. Plaintiffs sent them more money, and then when they found out that the defendant's deal was a scam, they sued in Wisconsin, and the Seventh Circuit said, by chasing them back to Wisconsin and continuing to make misrepresentations, you subjected yourself to jurisdiction in Wisconsin. Very similar to what happened here. Were there meetings in Arkansas? Yes, Your Honor, there were. There were two meetings. Go ahead. What's the relevance of those? Those are extremely relevant. They occurred after the initial contract was signed, but a few weeks later, Mr. Esabag first traveled to Arkansas and told them the same misrepresentations he said before, that everything was on schedule and that he was going to invest a bunch of money. A few weeks after that, the plaintiffs had started to learn, wait a minute, something's not right here, and told the defendants, we may not be able to make these payments that are in the schedule in our contract. Mr. Esabag got on a plane, flew to Arkansas, and told them, if you'll advance a million dollars under the contract, months before it was otherwise due, if you advance that million dollars, I'll renegotiate the entire payment schedule. They advanced the million dollars based upon that misrepresentation made to them in Bentonville, Arkansas, advanced them a million dollars, and he misrepresented what he was going to do. He never renegotiated. Is that a separate count or a separate claim, or is that part of one overall claim that there was fraud here? It's part of the one overall claim. We've alleged $3.5 million in damages, a million of which is from those in-person meetings in Arkansas. But all of it is as a result of the entire stream of misrepresentations designed to induce the investment in ULG. We've alleged securities fraud and common law fraud, among other claims, and those result from the entire stream of misrepresentation. So where do you think the district court went wrong, then, under your view? Your Honor, the district court went wrong in basically misapplying Walden to the facts of this case. The district court believed that under Walden, it was required to exclude contacts with the plaintiffs in Arkansas from the jurisdictional analysis. But while Walden says you have to look at contacts defendants created with the forum, not just contacts defendants created with the plaintiffs, Walden goes on to explain that probably the most relevant contacts are the ones defendants made with the plaintiffs in Arkansas. And that's got to be the case. Otherwise, you'd basically eliminate specific jurisdiction. Because to have specific jurisdiction, you have to have contacts that have something to do with the cause of action in the forum. And if you excluded everything that had to do with the plaintiffs from that analysis, you'd essentially get rid of it. And Walden doesn't even support that reading, because Walden says itself, the specific language is, contacts with the forum state may be intertwined with contacts with the defendants' interactions or transactions with the plaintiffs. And the Walden court specifically says physical entry into the jurisdiction, whether by mail, email, or in person, is an extremely relevant contact. In Walden, Walden involved a Georgia defendant who interacted with Nevada plaintiffs in Nevada, or in Georgia, only in Georgia. Never interacted in Nevada with them at all. And in fact, what the Walden court emphasized in that case in finding that there was no personal jurisdiction in Nevada, was that the defendant, quote, never traveled to, conducted activities within, contacted anyone in, or sent anyone to Nevada. Suppose we didn't have the meetings in Arkansas, the later meetings, upon which at least a part of that claim is based. Suppose all we had were the electronic communications and the meetings in California. Would there be personal jurisdiction? Your Honor, I would add, if you took out the in person meetings, there would be the electronic communications, the telephone calls in Arkansas. I'm kind of putting the text and the telephone together. Okay, I want to make sure that those phone calls are included because those are where these misrepresentations were directly delivered. Yes, there would be more than enough. I'd point the court for a post-Walden example of that, to the Chua case out of the Fifth Circuit that we cited in our brief. In that case, a 2018 opinion out of the Fifth Circuit, there was only one misrepresentation made in the telephone call that the defendant made into Texas to the plaintiff in Texas. That was the only contact with Texas, was that one phone call with a misrepresentation. And the Fifth Circuit held that that was more than enough to create personal jurisdiction. Because the defendant, by reaching into Texas and making a misrepresentation, established that purposeful contact with the forum that Walden recognized as enough. You know, I understand that. And I get this thing where, maybe I'm not understanding your argument exactly right, but I get what you're arguing is that, at least as to the advancing of the $1 million, that what that represents is that Mr. Eisenbach entered into Arkansas with the purpose of committing a common law tort therein, that is, fraud in the inducement, and induced a novation of that contract, which provided for the $1 million advance that would otherwise not have been due at that point. And that entering into the state to commit the tort, that that ought to be enough to get you there, right? But as I look at those contacts, and I look at the cases that are out there, you find cases that talk about committing a tort, an intentional tort, inside a jurisdiction, being sufficient to give rise to personal jurisdiction. But they tend to come out of states that have in their long-arm statute a specific reference to committing a tort within the state. So you have, you know, states like Florida and North Dakota that have that in their statute, which is not present in this case. Does that make any difference in your opinion at all? No, Your Honor, because Arkansas' long-arm statute extends the fullest maximum of constitutional limitations on due process. And so here we're within the same as any other one of these cases, and we've cited plenty of them in our brief, that says phone calls, e-mails, et cetera, into a jurisdiction for purposes of committing a tort are enough. And you can't just separate that out by saying that was just a contact with the plaintiff, it's not a contact with the forum. In fact, I'd direct this court. Why would we have a different rule for a tort case than a contract case? If this fast path case is still good law, then that seems to say doing those kinds of things in order to reach a contractual arrangement is not sufficient. Your Honor. Why do you think it would be different in a tort? Your Honor, the Calder case makes very clear from the United States Supreme Court that when there's an intentional tort, there are additional factors that are being considered. And this court has frequently recognized that. For example, in Oriental Trading, the only thing that happened in Oriental Trading was the defendant sent faxes and e-mails to Omaha. That was the only thing that ever happened. There were misrepresentations in those faxes and e-mails. This court held that that is enough. But Calder is more about the effects of the tort, not about the nature of the contacts that you're talking about, right? Well, Your Honor, that is certainly relevant. But here the effects were felt in Arkansas. They were felt by the plaintiffs in Arkansas. They spent $2.5 million of their money from Arkansas to California. This court has repeatedly looked at situations like that. Again, I draw this court's attention back to the Felland case. There, the Seventh Circuit recognized that when the plaintiff was chased back to Wisconsin and got additional misrepresentations made to them in Wisconsin by e-mail, phone, the defendant there never got on a plane and went to Wisconsin. He just called them up, e-mailed them, and said, everything's great. Okay, fine, I'll send you more money. The court said that was enough. That's exactly what happened here. Of these cases you've been discussing, how many of them are pre-Walden and how many of them are post-Walden? Your Honor, some of them I've been discussing are pre-Walden, but we've cited a number of post-Walden cases. For example, the Traw case I mentioned. Right. The other case I mentioned that's most on point, I think, is the Schmuckel case out of the Sixth Circuit. There, they made the exact same argument that the district court did here. The defendant said, I never contacted the forum. I only contacted plaintiffs within the forum. The Sixth Circuit said, no, that can't be right. The court said that would be an overly broad reading of Walden, and it specifically said it would severely limit the availability of personal jurisdiction if every defendant could simply frame his conduct as targeting only the plaintiffs and not the forum state. That's exactly what we have here, and that is why the district court's decision should be reversed. Unless the court has any questions at this time, I'll reserve the balance of my time. Very well. Thank you. May it please the court. Mr. Ross, we'll hear from you. Thank you, Your Honor. Pete Ross for respondents. I feel that I have something to add to the discussion here. In 2014, the landscape in this country changed concerning personal jurisdiction. In that year, the United States Supreme Court reached out and took two cases, one general jurisdiction, general personal jurisdiction, and one specific. Those were the Daimler case and the Walden v. Fiore. I think since then that we have to look for three guideposts in a specific jurisdiction context.  Daimler, and we need to look at Calder and Walden. The Supreme Court, in my view, chose these cases very carefully because they represent extreme examples, so it was easy to point out what the doctrine is in those cases. Daimler, despite the fact that Mercedes-Benz sells thousands of cars each year in California, the Supreme Court said no general jurisdiction. The corporation could only be sued where it is, quote, at home, close quote, which generally means where it's incorporated or where it has its headquarters. Calder, the National Enquirer had 600,000 subscribers in California. It's not at home there, so no general jurisdiction, but when the National Enquirer publishes an article that it sends to 600,000 readers in California that defames a person in California, that meets the international shoe minimum context test. Walden, a DEA agent who never leaves Georgia, stops a person at the airport who happens to be from Nevada. The DEA agent swears out a false affidavit in Georgia about the Nevada person. The DEA agent knows he is affecting a Nevada person in Nevada, but, says the Supreme Court, there are no international shoe minimum contacts here with Nevada. In fact, the only contact with Nevada was that the plaintiff happened to live there. Again, an extreme example. So how does that help you if that's such an extreme example? This is not an extreme case. Exactly. And so we are somewhere in between. So how do we decide post-Walden and post-Daimler? If we were dealing with Mercedes-Benz, it would be easy. Mercedes-Benz, they don't have 600,000 customers. They have a few thousand. But if one buys a car from them, it's a lemon, they can be sued in California, even though there are just a few thousand customers. What about the present case? I think, in my view, it's about as close to Walden as we can get without actually being Walden. Well, the equivalent of Walden would be, let's say you sent out a mass email to 150 people or 200 people, and it just so happens the person from Arkansas responds to a fraudulent message, sends money. But here you have a lot more. So this isn't really like Walden, is it? Well, it's not exactly Walden. It's somewhere between Walden and, let's say, the other side. So Mr. Essebag is sitting in California. He owns 100% of United Licensing Group, a California corporation headquartered in California. And the appellants come see him three times in person in California. They agree to buy 25% of United Licensing Group shares. But in between these visits, they communicate by text, email, and phone call. And after the deal is signed, Mr. Essebag goes to Arkansas twice for a few hours on each occasion and negotiates, according to them, an amendment to the contract. Does that fact pattern meet international SHU minimum contacts? That's the question. Should Mr. Essebag reasonably expect to be subject to suit in Arkansas under those circumstances? I think this court has already answered that question in the fast path case mentioned by Judge Coliton, where the fact pattern was extremely close to that. Well, in that case, the defendant didn't visit Iowa. So the facts that you just listed distinguish it right off the bat. So I don't think that answers it either. So let me move on to another aspect of this case that I think is very important that would help us with our jurisdictional analysis. There has to be at least a reasonable inference of wrongdoing based on the evidence submitted. They talk about three false promises. One is the false promise to spend $20 million on advertising. We know that that was made in person in California. It doesn't appear in any text or email thereafter. And there is no time frame for spending that money. He told us he would spend $20 million in advertising after the product launch. But there's no evidence as to whether he did or he didn't or what time frame he was supposed to spend that money in. Why do we care about the merits of the tort? Why isn't this just about the nature of the context that we take the complaint as true? The allegations. Well, I think the law is to the contrary, that we can't just make an allegation without any substance and expect a person to show up thousands of miles away to defend against it. That's too easy. That's not real due process. And I think that's what the law holds, that it's not. Well, was there any factual development here? Or was this ruling just on the pleading? Well, the appellants submitted declarations and exhibits. We submitted a counter declaration. But in our appellate papers here, we're relying solely on what they say. And what I'm pointing out is that You mean what the appellants say? What the appellants say in their declarations and exhibits, and if we look at them, there's nothing actionable. You can't have a promise to spend $20 million with no time frame and say they breached it. It's just not, there's no evidence of what the breach of that promise was. We don't even get to it was fraudulent because there's no evidence it was even breached. Second promise was that we would be ready to launch in June 2017. This promise, again, was made in person, supposedly, at the meeting in California in January. They didn't sign the deal until June, the month the product supposedly would be ready to launch. And the emails they attach to their papers show that when they signed the deal in June, the launch date had been pushed back to September. And they knew it before they signed the deal. Again, it just doesn't hold water. So what do you want us to do about that? Do you want us to affirm on the alternative ground that there is jurisdiction and that you went on the merits? Is that what you're suggesting? Well, I wouldn't frame it like that. I would say that under... I still don't understand how these points are relevant to the jurisdictional inquiry. The jurisdictional inquiry, and I'd have to look up the case, which I can do. The jurisdictional inquiry depends on evidence being submitted that there was wrongdoing that comes under the Calder-Walden test. And what I'm saying is that if we look at the evidence they submitted, in their papers, in their brief, they say they have to raise a reasonable inference that there was wrongdoing. And what I'm saying is that if we look at their documents carefully, there is no such reasonable inference. The third instance, and the final instance of alleged wrongdoing, was the meeting by Mr. Esabag in Arkansas on August 10, 2017. This is the only instance of any wrongdoing where they say anything was put into writing and sent into the state as well. So Mr. Esabag shows up for a few hours on August 10, and appellant Sean Hatch describes the matter in his affidavit. He says a payment of $5.75 million was due the following December 1. He said that Mr. Esabag promised if they advanced $1 million from the December 1 payment to October, no further payments would be due prior to the end of the year. And then at the end of the year, they would all sit down and discuss a new payment schedule. But they know Mr. Esabag lied, and they know he committed wrongdoing in Arkansas because he demanded a payment before the end of the year. That's what Mr. Hatch says, appellant. But he attaches to his own declaration an email he wrote confirming what happened on August 10 at the meeting. The email appears in the joint appendix at page 279, and here's what it says. I'm going to read from it exactly. Quote, our understanding is that we will make the $1 million payment on October 15, and we will do our best to make another payment by the end of the year. We will do our best to make another payment by the end of the year. And then he goes on. We will meet in January to review sales of Dr. Boost and determine an appropriate payment schedule going forward. If I misunderstood something on this, please let me know, close quote. So when Mr. Esabag asked for a payment before the end of the year, he was merely following up on what Mr. Hatch confirmed in his own email to Mr. Esabag. So suppose we, other than Merritt's point, suppose we just take on its face and assume that wrongdoing happened or arose out of that Arkansas meeting and that there was a misrepresentation. Is that enough for personal jurisdiction? Assuming away this Merritt's question you're asking us about or talking to us about. Well, I appreciate that question. And that is not an easy question in my view. That's why I asked it. Yeah. And I think that, you know, I've been practicing law for 35 years. Until 2014, if anybody could have said, would have said to me, you can't sue Mercedes-Benz in California under general jurisdiction, I would have been dumbfounded. I always assumed you could sue a company wherever it did a lot of business. It was subject to jurisdiction. The Supreme Court said no, that's not the case. And I would ask rhetorically, what's wrong with that? The Supreme Court cut way back on personal jurisdiction. And I think it was sending the message that, essentially, you have to go where someone lives in order to sue them. Well, and that happened here, right? He went to Arkansas and the premise of the question was, if he went to Arkansas and committed fraud and misrepresentation, is that enough? Well, I mean, what would we be getting out ahead of the Supreme Court? I think the Supreme Court would say no under these circumstances. You know, we all know the composition of the court's changing. It's something to consider. But I think that the answer would be no under these circumstances where someone passes through after a deal is made in California and allegedly says something that's a misrepresentation during a few-hour meeting in Arkansas. It's just too easy to file a complaint and say, without any evidentiary support, that that was wrongdoing. And I don't think it would hold up. And may I have, I'm out of time, but may I have 20 seconds to say a final word about United Licensing Group? Sure, go ahead and put 20 seconds on the clock. Okay. So I just would point- How long did 20 seconds turn into three minutes? Well, I'd just point out that not only did it not do anything wrong, but it was only tangentially involved in the transaction in issue. There's just no basis for jurisdiction over United Licensing Group whatsoever. Jimmy Eisebag sold his stock to the appellants. Thank you. You mean, I see. You think we should analyze the two separately? Yes. Well, I guess we have to. That was all. Yeah, thank you. Thank you. All right. Mr. Pecron, you have some time for rebuttal. Thank you. May it please the Court, approximately the last half of Appley's argument was directed at the merits of this case. But I think it's important for this Court to remember that our burden at this point is very minimal. In fact, in the KV case, it says we have a minimal evidentiary burden at this point. And all inferences are to be inferred in our favor. And so while Mr. Ross may have given a very good jury argument, that isn't what this Court is supposed to do at this point. Although on a jurisdictional motion to dismiss, we do look at evidence. It's different from a motion to dismiss for failure to state a claim. What relevance is there here to his argument then? Your Honor, I think there's very little on the points of whether or not they're misrepresentations or not. Typically, the type of affidavits, et cetera, you would look at are, did I actually go to Arkansas? Did I actually make a phone call? They don't dispute any of that. They don't dispute the jurisdictional facts. They don't dispute that Mr. Esabag twice came to Arkansas. They don't dispute that Mr. Esabag made a bunch of telephone calls into Arkansas. That's typically what a court would look at at this point in the case in evaluating evidence. And so if there was a dispute as to whether Mr. Esabag ever came to Arkansas or not, maybe we'd have to put forth some evidence showing that. They've admitted that. But what you can't do at the jurisdictional stage is say, well, I didn't make a misrepresentation because I think the words they used in their brief were, a reasonably plausible explanation of the evidence would be that it's not a misrepresentation. That's their argument. But that's not what the court does at this point in the case. This court assumes that there are misrepresentations and then determines the jurisdictional significance of them. And that's true even despite Calder, where we're asked to sort of evaluate the intentional tort. Absolutely. It's an allegation issue. And we've made allegations, this court, to assume that those allegations are true and go from there. What about this last point on United Licensing Group? Your Honor, they didn't make that point in their brief. But the only thing I would say about that is that Mr. Esabag is the 100% owner of United Licensing Group. To the extent United Licensing Group acts, it acted through Mr. Esabag. It was to get money that he claimed was going to be used to promote United Licensing Group. I see no reason why you would determine that Mr. Esabag was subject to jurisdiction. But when he was acting on behalf of United Licensing Group, he wouldn't also be. And with that, I would urge this court to reverse and allow this case to proceed in Arkansas. Thank you for your time. All right, very well. Thank you to both counsel for appearing here on an afternoon session. We appreciate your attention to the matter and your help with the case. The case is submitted and the court will file an opinion in due course.